United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11   CASSIE LEE MAY,                          No. C-12-02735-DMR

12              Plaintiff(s),                  **ORDER GRANTING DEFENDANT'S**
                                               **MOTION FOR SUMMARY JUDGMENT**
13        v.                                   **AND DENYING PLAINTIFF'S MOTION**
                                               **FOR SUMMARY JUDGMENT**
14   COMMISSIONER OF THE SOCIAL
     SECURITY ADMINISTRATION,
15
                Defendant(s).
16   _____/

17

18        Pursuant to 42 U.S.C. § 405(g), Plaintiff Cassie Lee May ("Plaintiff") seeks review of her

19   application for Supplemental Security Income ("SSI") disability benefits.  Defendant Social Security

20   Commissioner ("Defendant" or "Commissioner") denied her application after determining that

21   Plaintiff was not disabled under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §

22   1382c(a)(3)(A).  Plaintiff now requests judicial review of the Commissioner's decision pursuant to

23   42 U.S.C. § 405(g).  Both parties filed motions for summary judgment.  For the reasons stated

24   below, the court grants Defendant's motion and denies Plaintiff's motion.

25                              **I.  Procedural History**

26        On January 14, 2010, Plaintiff protectively filed an application for SSI benefits under Title

27   XVI of the Act, alleging disability beginning April 9, 2005.  Administrative Record ("A.R.") 56,

28   128-134.  Plaintiff alleged disability based on social anxiety disorder.  A.R. 145.  The agency denied

Plaintiff's claim, and subsequently denied it again upon reconsideration.  A.R. 58-63, 69-74.  On April 27, 2011, an administrative law judge (ALJ) held a hearing at which Plaintiff, represented by a non-attorney claimant representative, testified along with a vocational expert.  A.R. 29-55.  On May 18, 2011, the ALJ issued a written decision that Plaintiff was not disabled and denied her claim.  A.R. 17-28.  On March 24, 2012, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the Commissioner's final decision.  A.R. 1-6.  Plaintiff then filed this action.

## II.  Factual Background

### A.  Plaintiff's Background and Activities of Daily Living

The record contains the following information.  Plaintiff was born in April 1987.  A.R. 32.  During the relevant time period, she was single and lived with her mother.  A.R. 32-33.  On a normal day, Plaintiff woke around 11 a.m., watched television, used the computer, fed and cleaned up after her and her mother's four dogs and three cats, and completed housework and chores, including laundry, cleaning, vacuuming, and dishwashing.  A.R. 19, 41, 155.  Her mother left for work after Plaintiff had breakfast and returned from work around midnight.  A.R. 41-42.  Plaintiff prepared her own meals, and went grocery shopping with her mother but never by herself.  A.R. 42.  Plaintiff went shopping a "couple of times per week" for "everyday items such as food and [toiletries]," and was able to pay bills, count change, handle a savings account, and prepare money orders, but she had never used a checkbook.  A.R. 158.  Plaintiff did not have any physical problems, problems with personal care, or problems dressing, feeding, or bathing herself.  A.R. 42, 49, 155-57.  Her hobbies included watching television, making artwork, and collecting costume jewelry.  A.R. 159.  She sometimes went to antique shows with her mother to look at jewelry.  A.R. 45-46.  She visited her grandmother at least once a month.  A.R. 46.  Plaintiff stated that she had no friends and did not chat with anyone on the Internet.  A.R. 45.  She found it "difficult to talk to people and make any friends or go places with a lot of people."  A.R. 160.  She was "afraid of people judging [her] and making a mistake in public" and became "self conscience [sic] of [her] appearance in public."  A.R. 161.  She did not drive because she was too nervous.  A.R. 158.  She did not go to church, the library, or any

1  social gatherings or have other activities that would take her out of the house on a regular basis.

2  A.R. 46.

3      Plaintiff stated that she had never worked but had attempted to work by interviewing for jobs

4  a couple of years ago, but she "couldn't speak up and [the interviews] didn't go very well."  A.R. 34.

5  She had not looked for jobs since then because she gets too anxious and cannot communicate with

6  people.  A.R. 34.  She did not graduate from her regular high school because she "got anxious and . .

7  . overwhelmed and . . . didn't want to go to school," but was able to attend adult school and

8  complete her high school education around the same time she otherwise would have graduated.

9  A.R. 35-36.  Plaintiff did not repeat any grades and did not attend special education classes.  A.R.

10  36, 150.  She had "no problems walking [or] paying attention" and could follow written and spoken

11  instructions well.  A.R. 160.  Plaintiff stated that she could "get along[] well with authority figures."

12  A.R. 161.  She "handle[d] stress ok" but would get "overwhelmed and have to remember to relax."

13  A.R. 161.  She "like[d] routine but [] can handle changes pretty well."  A.R. 161.  Plaintiff stated

14  that she could perform a hypothetical job described by the ALJ that would require her to put items

15  into a box, work for the most part by herself, and occasionally interact with a boss.  A.R. 42-43.  But

16  she went on to explain to the ALJ that she would "probably miss a lot of work . . .because [she]

17  get[s] really anxious and sometimes [] just can't get to work."  A.R. 43.

18      Because Plaintiff did not drive, she normally traveled with her mother.  A.R. 39-40.  She

19  took the school bus by herself during the last couple of years of high school.  A.R. 40.  Her mother

20  drove her to doctor visits and she had not taken the bus by herself to visit the doctor.  A.R. 44.  She

21  did not believe she could take the bus by herself to see her doctor because she gets "too anxious

22  around people."  A.R. 44.  She testified that she was "not sure" why she was able to take the school

23  bus but not the bus to her doctor's office.  A.R. 45.  Upon further questioning by her attorney,

24  Plaintiff agreed that one of the reasons may be because the school bus would have the same people

25  every day, whereas different people would ride a public bus.  A.R. 47-48.

26      At the April 27, 2011 hearing, Plaintiff testified that she was taking Cymbalta and Buspar

27  every day, as prescribed by her then-treating psychiatrist Dr. Peña.  She did not experience any side

28  effects from those medications, but had stopped taking Abilify because it made her restless and

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   jittery.  A.R. 38.  Plaintiff testified that the medications were a "little bit" helpful.  A.R. 36-38.

2   Plaintiff had not been hospitalized nor had she visited the emergency room due to her condition.

3   A.R. 43.

4   **B.  Plaintiff's Relevant Medical History**

5       **I.  Dr. Koida**

6         Plaintiff submitted a few general medical records, mostly concerning treatment for an

7   infected cyst on the back of her neck.  A.R. 226-41.  One visit note by Dr. David Minoru Koida,

8   M.D. references Plaintiff's mental health.  Dr. Koida's October 9, 2008 record indicates that

9   Plaintiff complained of chest pains.  The visit note reflects that Plaintiff had a history of chronic

10  depression and was taking Paxil.  A.R. 227.  Plaintiff reported two months of "dull daily chest pains

11  . . . [n]ot associated with anything" that got worse with "movement or inspiration."  A.R. 227.  Dr.

12  Koida also noted that Plaintiff "stopped going [to her psychiatrist] since she didn't feel a connection

13  to her psychiatrist."  A.R. 227.  Dr. Koida recommended that Plaintiff continue to take Paxil and

14  stated that he thought "she would benefit from long term counseling."  Dr. Koida provided Plaintiff

15  with the phone number for the psychiatry department so that she could "establish with a new

16  counselor."  A.R. 228.

17      **ii.  Dr. Kagan**

18        Plaintiff received treatment from Alice L. Kagan, M.D. A.R. 242-53.  Plaintiff contacted Dr.

19  Kagan's office on February 15, 2008 for a refill of her Paxil prescription.  The medical assistant's

20  notes state that Plaintiff had last visited the office on August 3, 2007.  A.R. 249.  On September 22,

21  2009, Plaintiff visited Dr. Kagan for medication management.  A.R. 249.  Dr. Kagan noted that

22  Plaintiff "report[s] she is having diff finding a job" and that she "[s]tays home most of the time."

23  A.R. 249.  The notes also state: "Doesn't have transportation. Still with significant social phobia and

24  avoidance.  She recognizes some problem.  Feels meds help decrease her anxiety and depression

25  some."  A.R. 249.  Plaintiff did not report any side effects with her medication.  A.R. 249.  Dr.

26  Kagan "offered group treatment and therapy" and Plaintiff "show[ed] only mild if any interest."

27  A.R. 249.  Dr. Kagan assessed Plaintiff as having "sevre [sic] social phobia, dysthymia and

28  avoidance."  A.R. 250.  Dr. Kagan stated, "I believe she has a personality ds because of the extent of

United States District Court

For the Northern District of California

1  her impairment. She agrees to contact CA dept of vocational rehab." A.R. 250. There is no

2  evidence that Plaintiff contacted the state agency. Dr. Kagan also noted that Plaintiff declined

3  outpatient treatment initially because of "no transportation, little motivation." A.R. 251.

4      There are no further medication management visits with Dr. Kagan, nor are there are records

5  of individual or group therapy sessions. Dr. Kagan attempted to reach Plaintiff on January 28, 2010,

6  but Plaintiff was not in. A.R. 252. On March 28, 2010, Plaintiff "called because she will be losing

7  her Kaiser insurance, and is concerned about her medications." A.R. 252. Dr. Kagan advised

8  Plaintiff to continue taking Paxil as directed, offered to write a prescription for six months after

9  Plaintiff's loss of insurance, and referred her to Sonoma County MH, Southwest Health Clinic for

10  follow-up. A.R. 252-53. There is no evidence that Plaintiff contacted the Sonoma County clinic.

11  There was a gap of approximately four months between Plaintiff's treatment by Dr. Kagan and by

12  her subsequent treating psychiatrist, Dr. Peña. A.R. 39.

13      **iii. Dr. Zipperle**

14      On June 3, 2010, consultative examiner Marion-Isabel Zipperle, Ph.D., examined and

15  evaluated Plaintiff. A.R. 256-59. The "history of present illness" section of Dr. Zipperle's report

16  noted that Plaintiff had suffered from social anxiety since she was a child, felt hopeless, helpless,

17  and mistrustful, and had self-confidence and low motivation. A.R. 256. Plaintiff told Dr. Zipperle

18  that she had received therapy since she was 12 years old, but that her insurance coverage had run out

19  and that she had to find coverage for herself in order to continue therapy. A.R. 256.[1] Under the

20  "Activities of Daily Living" subheading of the "Current Level of Functioning" section, Dr. Zipperle

21  indicated that Plaintiff could "participate in self-care and house work." A.R. 257. Under

22  "Concentration, Persistence, and Pace," Dr. Zipperle wrote that when Plaintiff "gets nervous it is

23  difficult for her to concentrate, but when she is not nervous it is easy to get things done." A.R. 257.

24  Dr. Zipperle noted that Plaintiff's "[g]rooming and hygiene were good." A.R. 257. Dr. Zipperle

25  made an Axis I diagnosis of anxiety with agoraphobia and depression. The Axis II diagnosis was

26  schizoid personality disorder. Dr. Zipperle noted under Axis IV that Plaintiff had difficulty relating

27

28      [1] It does not appear that Plaintiff submitted any records of therapy sessions.

5

1  to the outer world, and difficulty dealing with life, occupation, and academic issues.  Dr. Zipperle

2  gave Plaintiff a GAF score of 54.  She opined that Plaintiff's "[p]rognosis is poor due to her

3  inabilities to leave the house and for her to function on the outside of her home, difficulty with

4  feelings of depression and hopelessness, helplessness, self-confidence issues, losing interest in what

5  she used to like to do, low motivation, anxiety, mistrust of others, problems dealing with crowds,

6  and inability to make friends outside her family."  A.R. 258.  Dr. Zipperle noted that Plaintiff was

7  "not in therapy at this time, but it would not solve her problems in 12 months."  A.R. 258.

8         Dr. Zipperle provided the following functional assessment: Plaintiff was capable of

9  managing her own funds; Plaintiff could do simple and repetitive tasks; Plaintiff "would have

10  difficulty dealing with supervisors and interacting with coworkers and the public"; Plaintiff "would

11  not need special or additional instructions to work, but her psychiatric issues would get in the way of

12  her regularly attending a workplace"; Plaintiff "would have difficulty performing and her psychiatric

13  issues would get in the way of her workweek and workday"; and Plaintiff "is impaired in dealing

14  with stress in the workplace."  A.R. 258-59.

15  **iv.  Dr. Meenakshi**

16         On July 2, 2010, V. Meenakshi, M.D., a State agency psychological consultant, reviewed

17  Plaintiff's medical records and completed a psychiatric review.  A.R. 262-72.  Dr. Meenakshi found

18  the following "B criteria" limitations[2]: (1) no restriction of activities of daily living; (2) "moderate"

19  difficulty in maintaining social functioning; (3) "moderate" difficulties in maintaining concentration,

20  persistence, or pace; and (4) "insufficient evidence" to determine whether Plaintiff had repeated

21  episodes of decompensation, each of extended duration.  A.R. 270.

---

26      [2]  "B criteria" refer to certain functional limitations that a claimant must demonstrate in order

27  to show that her impairment meets or equals one of a list of specific impairments described in 20 C.F.R.
Part 404, Subpart P, Appendix 1, which is Step Three of the five-step sequential evaluation process and
is described in greater detail below.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06(B); 20 C.F.R. §§

28  404.1520, 416.920.

On July 7, 2010, Dr. Meenakshi assessed Plaintiff's mental residual functional capacity ("RFC")[3] and concluded that she could perform simple tasks with limited public contact.  A.R. 272, 275.  Dr. Meenakshi determined that Plaintiff was not significantly limited in the following abilities: remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for an extended period; performing scheduled activities; maintaining regular attendance; remaining punctual; sustaining an ordinary routine without supervision; making simple work related decisions; completing a normal work week; asking simple questions or requesting assistance; being aware of normal hazards and taking appropriate precautions; traveling to unfamiliar places and using public transportation; and setting realistic goals and independently making plans. A.R. 273-74.

Dr. Meenakshi concluded that Plaintiff was moderately limited in the following abilities: understanding, remembering, and carrying out detailed instructions; working with or close to others without being distracted; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers; and responding appropriately to changes in work setting.  A.R. 273-74.

Dr. Meenakshi opined that Plaintiff "is looking for work" but had not "gone for enough interviews because of lack of transportation and not her anxiety.  A.R. 272.

**v. Dr. Bianchi**

On June 17, 2010, P. Bianchi, M.D., a State agency medical consultant, reviewed the medical record.  Dr. Bianchi determined that Plaintiff had no medically determinable physical impairment. A.R. 261, 21.

**vi. Dr. Walk**

On August 25, 2010, State agency psychiatrist D. Walk, M.D., reviewed the medical record and concluded that Dr. Zipperle's June 3, 2010 conclusion "is not corroborated in other MER [medical evidence of record] to the extent of Disability."  A.R. 282-83. Dr. Walk opined that

---

[3]    The evaluation process includes an assessment of a claimant's RFC, which is "the most [a claimant] can still do" despite physical and mental limitations caused by her impairments.  20 C.F.R. § 416.945.

United States District Court
For the Northern District of California

1    Plaintiff was "essentially not in treatment and there is minimal documentation of agoraphobia."

2    A.R. 283.  Dr. Walk agreed with Dr. Meenakshi's RFC.  A.R. 283.

3         **vii.  Dr. Peña**

4         Plaintiff saw Van Arthur Peña, Ph.D., M.D., from October 2010 to February 2011.  A.R.

5    294-303.  Dr. Peña's October 30, 2010 treatment notes reflect Plaintiff's complaint of social anxiety.

6    A.R. 294.  His notes of this initial visit indicate that Plaintiff had a hard time talking to people, that

7    she was nervous in public, and that she stays at home.  A.R. 294.  She was uncomfortable outside the

8    home, but did not feel hopelessness or depression when in her home.  A.R. 294.  She had trouble

9    going to school, and it was difficult for her to answer questions in class.  A.R. 294.  She reported

10   some improvement in going out to restaurants, in that she could now eat, when before she could not.

11   A.R. 294.  Additionally, Plaintiff said she took care of four dogs and three cats, watched television,

12   and did some housework.  A.R. 295.  Plaintiff was taking Paxil and claimed it helped her "forty to

13   fifty percent."  A.R. 295.  Dr. Peña diagnosed Plaintiff with social anxiety disorder, noting that

14   Plaintiff's mother apparently had also had the condition and gradually "outgrew it."  Dr. Peña added

15   Abilify to Plaintiff's Paxil regimen.  A.R. 295.

16        At her second visit on November 12, 2010, Dr. Peña wrote that Plaintiff was taking Abilify

17   and Paxil.  A.R. 296.  Plaintiff said she was uncomfortable talking with strangers but had more

18   energy and was a little bit better around people.  A.R. 296.  On December 27, 2010, Dr. Peña started

19   Plaintiff on Prozac and began reducing her Paxil use.  A.R. 300.

20        On December 27, 2010, Dr. Peña completed a mental residual functional capacity

21   questionnaire.  A.R. 289-300.  He diagnosed Plaintiff with social anxiety and dependent personality

22   disorder.  A.R.  289.  Dr. Peña noted Plaintiff exhibited symptoms including "anhedonia or

23   pervasive loss of interest in almost all activities," "decreased energy," "psychomotor agitation or

24   retardation," and "emotional withdrawal or isolation."  A.R. 290.  Dr. Peña also noted that Plaintiff's

25   medication caused "mild improvement in energy" and Plaintiff was "slightly less anxious around

26   other people."  A.R. 289.  Plaintiff did not report any side effects from her treatment.  A.R. 289.  Dr.

27   Peña noted that her prognosis was "fair to good with ongoing medical and therapeutic counseling."

28   A.R. 289.

Dr. Peña opined that Plaintiff had no ability to perform the following activities: maintaining regular attendance and punctuality within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; dealing with normal work stress; interacting appropriately with the general public; traveling to an unfamiliar place; and using public transportation.  A.R. 291-92.

Dr. Peña wrote that Plaintiff "cannot function around others without excessive anxiety, withdrawal" and "cannot work in occupation which requires contact with strangers, or at this point nearly anyone other than her mother."  A.R. 291.  Dr. Peña also noted that Plaintiff "has shown no ability to be in presence of peers without distracting them because of her own emotional discomfort."  A.R. 291.

Dr. Peña opined that Plaintiff was "very good" in the following areas: remembering work like procedures; understanding, remembering, and carrying out very short and simple instructions; understanding, remembering, and carrying out detailed instructions; maintaining attention for two hours; asking simple questions or requesting assistance; being aware of normal hazards and taking appropriate precautions; and adhering to basic standards of neatness and cleanliness.  A.R. 291-92.

**C. Vocational Expert's Testimony**

Vocational Expert ("VE") Robert A. Rashke, M.A., testified at the hearing.  A.R. 50-54.  The ALJ posed two hypotheticals to the VE.  First, the ALJ asked for two representative examples of jobs that could be performed by an individual with the same age, education, and background as Plaintiff who did not have any exertional restrictions, "but from a nonexertional standpoint . . . [the job]. . . is unskilled in nature, and does not involve interaction with the general public, and has only limited interaction with co-workers and supervisors," thus ruling out "tandem work that requires coordinated work with another individual."  A.R. 51.  The VE stated there were several light cleaning jobs that would fit this criteria, including laboratory assistant; housekeeper; school janitor; and industrial cleaner.  A.R. 52.  The VE testified that these types of jobs "are pretty much unsupervised" and "there probably would be hardly any interactions with other people."  A.R. 53.

The second hypothetical the ALJ posed was: "If we assume an individual with the same set of factors as the first individual, but this individual may miss work on a regular basis, two or more times per month on a regular basis[,] [c]ould such an individual sustain employment?" A.R. 53. The VE responded, "[T]hat really becomes a problem. And with these kinds of jobs, I think, if you're missing one time a month you're going to be out of a job, because they really depend on you. But I think in any industry if you reach two times a month with entry level employment you're unemployable." A.R. 53.

### III.  The Five-Step Sequential Evaluation Process

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[4] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater,* 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.  At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.  At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled

3.  At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt.

---

[4]  Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.   At the fourth step, the ALJ considers an assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.   At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett,* 180 F.3d at 1098-99.

### IV.  The May 18, 2011 ALJ Decision

In the May 18, 2011 decision, the ALJ applied the five-step sequential evaluation to determine whether Plaintiff was disabled.  A.R. 14-28.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date of her SSI application.  A.R. 19.  At Step Two, the ALJ found that the Plaintiff's alleged anxiety disorder with social phobia was a severe impairment.  A.R. 19.  At Step Three, the ALJ found that Plaintiff's impairment did not meet or equal a presumptively disabling impairment in the Listings.  A.R. 19-20.  The ALJ then found that Plaintiff had an RFC that allowed her "to perform a full range of work at all exertional levels with the following non-exertional limitations:  [Plaintiff] should have no interaction with the public and limited interaction with co-workers."  A.R. 20-21.  At Step Four, the ALJ found that Plaintiff had "no past relevant work to which she could return."  A.R. 23.  At Step Five, the ALJ determined that Plaintiff was not disabled because there were a significant number of jobs in the national economy that Plaintiff could perform, considering her age, education, work experience, and RFC.  A.R. 23-24.

### V. Issues Presented

Plaintiff contends that the ALJ erred at Steps Three and Five of the sequential evaluation process.  Specifically, the court will consider the following issues:

United States District Court

For the Northern District of California

1.   Whether the ALJ's finding that the medical evidence did not establish the presence of a listing-level impairment was supported by substantial evidence;

2.   Whether the findings on RFC were supported by substantial evidence and whether the ALJ properly gave more weight to non-examining physicians over the opinions of examining physicians;

3.   Whether the ALJ improperly discounted Plaintiff's statements about symptoms and limitations; and

4.   Whether the ALJ improperly found that the Commissioner met his burden of showing that Plaintiff can perform some other work that exists in "significant numbers" in the national economy, taking into account her RFC age, education, and work experience.

## VI.  Standard of Review

The ALJ's underlying determination "will be disturbed only if it is not supported by substantial evidence or it is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (internal quotation marks omitted).  "Substantial evidence" is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is "more than a mere scintilla" but less than a preponderance. *Id.*  If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  The ALJ is responsible for determining credibility and resolving conflicts in medical testimony, resolving ambiguities, and drawing inferences logically flowing from the evidence. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982); *Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## VII.  Discussion

**A.  Presence of a Listing-Level Impairment**

Plaintiff argues that the ALJ lacked substantial evidence to support a finding that the medical evidence did not establish the presence of a listing-level impairment at Step Three of the sequential evaluation process.

To evaluate disabilities based on mental illness, the agency considers documentation of medically determined impairments, the degree of limitations such impairments cause in the applicant's ability to work, and whether the limitations have lasted or can be expected to last for at least twelve months. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00A. Mental impairments may be evaluated under any one of nine separate categories. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.01. The ALJ evaluated Plaintiff using 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.06, which addresses anxiety related disorders. Section 12.06 first provides an introductory statement characterizing the nature of the impairment, and Subpart A sets forth the criteria supporting the specific medical diagnosis. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.06A.

Section 12.06A requires "medically documented findings" of at least one of several symptoms, including "[a] persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06A (anxiety disorders). The ALJ appears to have accepted, without discussion, that Plaintiff satisfied the requirements of Sections 12.06A. This finding is supported by substantial record evidence, which documents Plaintiff's nervousness and anxiety about socializing, interacting with the public, driving, riding public transportation, and leaving her home.

The ALJ was then required to consider whether Plaintiff's mental impairments meet at least two of the four so-called "B criteria": (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06; *see also* 20 C.F.R. § 1520a; 20 C.F.R. § 416.920(a)(4)(iii).

Plaintiff argues that her impairment caused "marked" restriction of her activities of daily living, not merely "mild" restriction, as the ALJ had found. Plaintiff also argues that she her impairment caused "marked" rather than "moderate" difficulties in maintaining social functioning.

**I. Activities of Daily Living**

The regulations describe what constitutes "marked" restriction on the "activities of daily living":

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.
>
> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1).  The ALJ concluded that Plaintiff only had "mild" restriction in her activities of daily living, and listed some activities she was and was not capable of performing:

> In activities of daily living, the claimant has mild restriction.  For example, she has transportation problems, does not drive because she is afraid to drive, and gets nervous behind the wheel. [Citing Dr. Zipperle's report.]   The claimant can participate in self-care and housework (*id.* at 4).  She reported that she cares for four dogs and three cats, watches television, and does some housework.  [Citing Dr. Peña's medical records.]  The claimant wrote that she prepares her breakfast, might go shopping with her mother, takes care of her pets, and does some housecleaning. [Citing Plaintiff's Function Report.]

A.R. 19-20.  The evidence in the record shows that Plaintiff was capable of carrying out all activities of daily living without restriction when in her home. The evidence also shows that Plaintiff faced limitations in her ability to carry out daily activities outside the home, such as shopping or driving, but that she was able to take the bus by herself to school.  She was able to complete her high school degree on time by attending the adult school, and did not require special education services.  The ALJ's decision weighed the competing facts.  A reasonable mind could conclude, based on the record, that Plaintiff was mildly restricted in her activities of daily living.  The ALJ's determination that Plaintiff impairment caused "mild" restrictions on her activities of daily living was thus supported by substantial evidence.

**ii.  Difficulties in Maintaining Social Functioning**

**United States District Court**
For the Northern District of California

The regulations also describe what constitutes "marked" difficulties in maintaining social functioning:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other social contexts.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(2).

The ALJ concluded that Plaintiff had "moderate" difficulties in maintaining social functioning:

> In social functioning, the claimant has moderate difficulties. For example, she reported social anxiety since she was a child and problems with friendships. [Citing Dr. Zipperle's report.] She attended school and graduated from high school, but reported that she missed a lot of school because of anxiety (*id.* at 4). The clamant wrote that she goes outside occasionally. [Citing Plaintiff's Function Report.] She wrote that she goes shopping a couple of times a week in stores (*id.*). She explained that she had found that she gets along well with authority figures (*id.* at 10). The claimant's mother wrote that the claimant had trouble talking to people, eating out, or being in large crowds. [Citing to Diana May's Function Report, A.R. 165.] The claimant testified that she took the bus to school during her last couple of years of high school.

A.R. 20. Some evidence in the record shows that Plaintiff was able to interact with people, e.g. with her grandmother, with her doctors, with authority figures, and with storekeepers and clerks and others while on shopping trips for shoes, clothes, and groceries while in the presence of her mother. Other evidence in the record points to Plaintiff's isolation and difficulty in interacting independently with the public, and her inability to function outside her home. On balance, as a reasonable mind could agree with the conclusion reached by the the ALJ that Plaintiff's difficulties in maintaining social functioning were only "moderate," the determination was supported by substantial evidence in the record.

**United States District Court**
For the Northern District of California

1    Accordingly, the court upholds the ALJ's determination that Plaintiff's impairments do not

2    meet or equal any impairments in the Listings.

3    **B. Evaluation of Medical Evidence Regarding Plaintiff's RFC**

4    The ALJ determined that Plaintiff "has the residual functional capacity to perform a full

5    range of work at all exertional levels but with the following non-exertional limitations: The claimant

6    should have no interaction with the public and limited interaction with co-workers." A.R. 21.

7    Plaintiff contends that the ALJ erred in determining Plaintiff's RFC because the ALJ improperly

8    weighed the medical opinions of non-examining physicians over Plaintiff's treating and examining

9    physicians.

10    When reviewing an ALJ's medical opinion determinations, courts distinguish between three

11    types of physicians: those who treat the claimant ("treating physicians"); and two categories of

12    "nontreating physicians," those who examine but do not treat the claimant ("examining physicians")

13    and those who neither examine nor treat the claimant ("nonexamining physicians"). *See Lester v.*

14    *Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  A treating physician's opinion is entitled to more weight

15    than an examining physician's opinion, and an examining physician's opinion is entitled to more

16    weight than a nonexamining physician's opinion. *Id.*

17    The ALJ is entitled to resolve conflicts in the medical evidence. *Sprague v. Bowen,* 812 F.2d

18    1226, 1230 (9th Cir. 1987).  However, to reject the opinion of an uncontradicted treating or

19    examining physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830;

20    *see also* § 416.927(d)(2); SSR 96-2p, 1996 WL 374186.  If another doctor contradicts a treating or

21    examining physician, the ALJ must provide "specific and legitimate reasons" supported by

22    substantial evidence to discount the treating or examining physician's opinion. *Lester*, 81 F.3d at

23    830-31.  The ALJ meets this burden "by setting out a detailed and thorough summary of the facts

24    and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*,

25    157 F.3d at 725.  A nonexamining physician's opinion alone cannot constitute substantial evidence

26    to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4

27    (9th Cir. 1990), though it may be persuasive when supported by other factors. *See Tonapetyan v.*

28    *Halter*, 242 F.3d 1144, 1149 (9th Cir. 2002) (noting that opinion by "non-examining medical expert

1  . . . may constitute substantial evidence when it is consistent with other independent evidence in the

2  record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given

3  contradictory laboratory test results, reports from examining physicians, and testimony from

4  claimant). An opinion more consistent with the record as a whole generally carries more

5  persuasiveness. *See* §416.927(d)(4).

6      The ALJ noted that Dr. Zipperle, an examining nontreating physician, determined that

7  Plaintiff "would have difficulty dealing with supervisors and interacting with coworkers and the

8  public." A.R. 22. The ALJ gave "some weight" to Dr. Zipperle's opinion, but noted that the

9  "evidence as a whole . . . supports that [Plaintiff] would have some limitations interacting with

10  others, but not to such an extreme extent. Motivation, as opposed to a severe impairment, seems to

11  be the controlling variable." A.R. 22. The ALJ also noted that the assessment of one of Plaintiff's

12  treating physicians, Dr. Peña, "would result in a finding of disability," but the ALJ discounted Dr.

13  Peña's assessment as being "not well supported by the record as a whole, and particularly not by his

14  limited treatment notes." A.R. 22.

15      In discounting the opinions of these treating and examining physicians, the ALJ relied upon

16  statements and testimony regarding Plaintiff's ability to perform many activities of daily living.

17  A.R. 21-23. The ALJ also commented upon the treatment notes from Dr. Kagan, another treating

18  physician, showing that Plaintiff did not follow up on Dr. Kagan's recommendation to contact the

19  California Department of Vocational Rehabilitation, and initially declined Dr. Kagan's

20  recommendation for outpatient treatment because of "no transportation, little motivation." A.R. 22.

21  The ALJ also cited to the assessments of nonexamining physicians Drs. Bianchi, Meenakshi, and

22  Walk, which provided evidence that Plaintiff was able to perform simple tasks with limited public

23  contact. A.R. 22. The ALJ noted that Dr. Walk stated that Dr. Zipperle's opinion regarding

24  Plaintiff's "anxiety w/ Agorophobia [sic] and Depression and Personality Disorder and Adverse

25  MSS . . . is not corroborated in other MER [medical evidence of record] to the extent of Disability."

26  A.R. 22 (citing A.R. 282). The ALJ also noted that Dr. Walk found that Plaintiff was "essentially

27  not in treatment and there is minimal documentation of Agorophobia [sic]." A.R. 22 (citing A.R.

28  282). The ALJ also noted that "[t]reatment records are relatively unremarkable and show very

1   limited treatment, especially considering that the claimant alleges that she has had a severe

2   impairment of social anxiety since early childhood.  The record shows that she has refused

3   treatment, which was characterized by a treating source to be due to a lack of motivation and

4   transportation."  A.R. 23.

5          The record contains substantial evidence that could lead a reasonable mind to agree with the

6   ALJ's conclusion that Dr. Zipperle's single consultative evaluation and Dr. Pena's opinions based

7   on a limited treatment record were not consistent with the medical record as a whole.  Plaintiff's

8   medical history is sparse.  There are no records indicating attempts at group or individual therapy,

9   substantial medication regimens, records indicating problems at school, or other indicia of a person

10  suffering from a debilitating mental disability since early childhood.  Plaintiff reported to Dr. Kagan

11  that her medications helped decrease her anxiety and depression some.  Plaintiff reported to Dr. Peña

12  that she was taking Paxil and it was helping her forty to fifty percent.  Dr. Peña noted that Plaintiff's

13  prognosis was "fair to good with ongoing medical and therapeutic counseling."  A.R. 289.

14         The ALJ offered specific, legitimate reasons for discounting the opinions of Drs. Zipperle

15  and Peña.  Since the evidence reasonably could support the ALJ's conclusions, this court may not

16  substitute its judgment for that of the Commissioner, and must affirm this finding.  Accordingly, the

17  ALJ did not err in weighing the medical evidence to determine Plaintiff's RFC, and substantial

18  evidence supports the ALJ's conclusions.

19  **C. Plaintiff's Credibility**

20         The ALJ found that Plaintiff's "medically determinable impairments could reasonably be

21  expected to cause the alleged symptoms; however, the claimant's statements concerning the

22  intensity, persistence and limiting effects of these symptoms are not credible to the extent that they

23  are inconsistent with the above residual functional capacity assessment."  A.R. 23.  Plaintiff argues

24  that the ALJ erred in discounting Plaintiff's symptom reporting as not credible.

25         An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional

26  impairment.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5) (A)).

27  Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons."

28  *Reddick*, 157 F.3d at 722 (citation omitted).  If an ALJ discredits a claimant's subjective symptom

United States District Court

For the Northern District of California

1   testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968,

2   972 (9th Cir. 2006).

3          In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must

4   specifically identify what testimony is credible and what evidence undermines the claimant's

5   complaints." *Id.* at 972 (quotations omitted).  The ALJ may consider "ordinary techniques of

6   credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in

7   testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately

8   explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*,

9   80 F.3d 1273, 1284 (9th Cir. 1996).  The determination of whether or not to accept a claimant's

10  testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529,

11  416.929; *Smolen*, 80 F.3d at 1281 (citations omitted).  First, the ALJ must determine whether or not

12  there is a medically determinable impairment that reasonably could be expected to cause the

13  claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a

14  claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the

15  claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical

16  evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d

17  341, 343, 346-47 (9th Cir. 1991) (en banc) (citations omitted).  Absent affirmative evidence that the

18  claimant is malingering,[5] the ALJ must provide specific "clear and convincing" reasons for rejecting

19  the claimant's testimony.  *Smolen*, 80 F.3d at 1283-84.

20          The Ninth Circuit has "long held that, in assessing a claimant's credibility, the ALJ may

21  properly rely on "unexplained or inadequately explained failure to seek treatment or to follow a

22  prescribed course of treatment." (quotations omitted). *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th

23  Cir. 2012).  According to agency rules, "the individual's statements may be less credible if the level

24  or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or

25  records show that the individual is not following the treatment as prescribed and there are no good

26  reasons for this failure."  SSR 96-7p, 1996 WL 374186 at *7.  Moreover, a claimant's failure to

27

28          [5] The ALJ did not conclude that plaintiff was a malingerer.

19

assert a good reason for not seeking treatment, "or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." *Fair,* 885 F.2d at 603; *Molina,* 674 F.3d at 1113 ("Although Molina provided reasons for resisting treatment, there was no medical evidence that Molina's resistance was attributable to her mental impairment rather than her own personal preference, and it was reasonable for the ALJ to conclude that the 'level or frequency of treatment [was] inconsistent with the level of complaints.'").

As noted above, the ALJ gave several reasons for failing to credit fully plaintiff's testimony. Most notably, the ALJ stated that the "[t]reatment records are relatively unremarkable and show very limited treatment, especially considering that the claimant alleges that she has had a severe impairment of social anxiety since early childhood." A.R. 23. The ALJ also noted that "[t]he record shows that she has refused treatment, which was characterized by a treating source[] to be due to a lack of motivation and transportation." A.R. 23. The ALJ's conclusion is supported by evidence in the record showing that Plaintiff visited or called Dr. Kagan only a few times between 2008 and 2010, did not follow up on Dr. Kagan's recommendations in part because of "low motivation," and did not state any reasons for not seeking the recommended treatments. Accordingly, the ALJ provided clear and convincing reasons for rejecting plaintiff's testimony.

**D. Existence of Jobs**

The claimant has the burden of proof at Steps One through Four of the sequential evaluation process, and the Commissioner has the burden of proof at Step Five. *Bustamante,* 262 F.3d at 953-54 (citing *Tackett*). If, at Step Four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity, age, education, and work experience. *Tackett,* 180 F.3d at 1098, 1100; *Reddick,* 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grids"). *Osenbrock v. Apfel,* 240 F.3d 1157, 1162 (9th Cir. 2001) (citing *Tackett*). "When the grids do not completely describe the claimant's abilities and limitations, such as when the claimant has both exertional and nonexertional limitations . . . the

United States District Court

For the Northern District of California

1   grids are inapplicable and the ALJ must take the testimony of a vocational expert." *Moore v. Apfel*,

2   216 F.3d 864, 869 (9th Cir. 2000).

3         ALJs may rely on the Dictionary of Occupational Titles ("DOT") and testimony from

4   vocational experts in making disability determinations.  SSR 00-4p, 2000 WL 1898704 at *2.  The

5   DOT is a reference guide in the form of a job catalog that contains standardized occupational

6   information about each job.  An ALJ is to "rely primarily on the DOT . . . for information about the

7   requirements of work in the national economy."  *Id.*  An ALJ may also call upon a VE to provide

8   occupational evidence through testimony at a disability benefits hearing.  *Id.*  As part of a disability

9   determination, an ALJ must address any conflicts between the VE's testimony and information

10   contained in the DOT.  *Id.* at *1.  The ALJ has an "affirmative responsibility to ask about any

11   possible conflict between [the VE's testimony about the requirements of a job] and information

12   provided in the DOT . . ."  *Id.* at *4; *see also Massachi v. Astrue*, 486 F.3d 1149, 1150 (9th Cir.

13   2007) (SSR 00-4p obligates the ALJ to identify and elicit an explanation for any conflict between a

14   VE's testimony and the information in the DOT).  To comply with SSR 00-4p, "the ALJ must first

15   determine whether a conflict exists.  If it does, the ALJ must then determine whether the vocational

16   expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert

17   rather than the [DOT]."  *Massachi*, 486 F.3d at 1153.  Failing to ask whether there is a conflict

18   between the VE's testimony and the DOT is harmless error where there is no apparent conflict or

19   where the VE explained the reason for the deviation.  *Id.* at 1154, n.19.  If the ALJ does not comply

20   with SSR 00-4p, then a reviewing court "cannot determine whether substantial evidence supports the

21   ALJ's step-five finding that [claimant] could perform other work."  *Id.* at 1154.

22         The ALJ asked the VE whether jobs existed in the national economy for an individual with

23   the claimant's age, education, work experience, and RFC.  The ALJ specified that the individual's

24   nonexertional limitations required a job that "does not involve interaction with the general public,

25   and has only limited interaction with co-workers and supervisors."  The ALJ's decision noted that

26   "[t]he vocational expert testified that given all of these factors the individual would be able to

27   perform the requirements of representative unskilled occupations such as: a lab equipment cleaner,

28   DOT number 381.687-022, a housekeeping cleaner, DOT number 323.687-014, and an industrial

cleaner, DOT number 381.687-018." A.R. 24. The VE stated that collectively these representative occupations number about 1.5 million in the national economy and five thousand in the local economy. A.R. 24. The ALJ also stated, "Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*." A.R. 24.

Plaintiff argues that the Commissioner failed to meet his burden of showing the existence of significant numbers of jobs that Plaintiff could perform because these representative occupations did not meet the requirements of having just limited contact with co-workers and no contact with the public. However, nothing in the DOT descriptions of the above occupations show that these occupations require contact with the public or more than limited interaction with co-workers. Accordingly, the VE's testimony that these types of cleaner jobs "are pretty much unsupervised" and "there probably would be hardly any interactions with other people" was consistent with the information contained in the DOT. The ALJ's determination that Plaintiff can perform some other work that exists in significant numbers in the national economy, taking into account her RFC, age, education, and work experience, was supported by substantial evidence.

**VIII. Conclusion**

Based on the foregoing reasons, the court finds that the ALJ's decision that Plaintiff was not disabled was supported by substantial evidence in the record and in accordance with law. Accordingly, the court grants Defendant's motion for summary judgment and denies Plaintiff's motion for summary judgment.

IT IS SO ORDERED.

Dated: May 31, 2013

_____
DONNA M. RYU
United States Magistrate Judge

United States District Court
For the Northern District of California